Richard **TACKETT**, Plaintiff–Appellant,

v.

Kenneth S. **APFEL**, Commissioner, Social Security Administration, Defendant–Appellee.

No. 97–36120.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 16, 1999.

Decided June 25, 1999.

Ralph Wilborn, Ralph Wilborn and Etta L. Wilborn, Eugene, Oregon, for plaintiff-appellant.

Renee C. McFarland, Assistant Regional Counsel, Seattle, Washington, for defendant-appellee.

Before: PREGERSON and THOMPSON, Circuit Judges, and MOSKOWITZ, District Judge.[1]

PREGERSON, Circuit Judge:

In 1993, Richard Tackett applied for Social Security disability insurance benefits under 42 U.S.C. §§ 423(d) and 416(i) of the Social Security Act. In his application, he alleged that he has been disabled since September 16, 1991. In March of 1995, the Administrative Law Judge ("ALJ") determined that under the Guidelines[2] Tackett's severe knee problems qualified him as disabled since his fiftieth birthday on February 7th, 1995, but that Tackett was not qualified as disabled from September 16, 1991 until February 6, 1995, the day before his fiftieth birthday.

---

1. The Honorable Barry T. Moskowitz, United States District Judge for the Southern District of California, sitting by designation.

2. The Medical–Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2, are discussed in detail, infra.

Tackett appeals the ALJ's decision to deny him benefits for the period from September 16, 1991 to February 6, 1995. He claims that the ALJ's decision denying him benefits during that period is not supported by substantial evidence and is based on errors of law. The district court had jurisdiction pursuant to 42 U.S.C. § 405(g) and affirmed the denial of benefits for that period. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## I. Facts and Prior Proceedings.

Tackett has had problems with his knees for well over ten years. One of his treating physicians stated that Tackett's left knee was "one of the worst knees" he had ever operated on. It is undisputed that Tackett is currently disabled. To determine whether Tackett was disabled before his fiftieth birthday, a review of the facts is necessary.

In 1988, Tackett had surgery on his right knee under the care of Dr. Michael Lawley. In 1991, he had surgery on his left knee, again under the care of Dr. Lawley. Dr. Lawley thought that Tackett would someday need total replacements of both knees and a hip replacement necessitated by his knee problems.

In September of 1991, Tackett lost his balance and fell while at work. After this accident, Tackett's knee problems got so bad that he had to leave his job as a machinist. In 1994, Tackett took a job at ACE Hardware but could not manage the work because of his knees. He left after a month.

Based on these medical problems, Tackett filed an application for Social Security disability benefits on July 29, 1993, alleging that he has been disabled since September 16, 1991. The Commissioner of the Social Security Administration ("Commissioner") denied both Tackett's application and his request for reconsideration. See 20 C.F.R. §§ 404.901(a)(1)-(2), 404.907. Tackett timely requested and was granted a hearing before the ALJ. See 20 C.F.R. §§ 404.901(a)(3), 404.929–933. On March 21, 1995, the ALJ determined that Tackett became disabled under the Medical–Vocational Guidelines when he turned fifty on February 7, 1995, but that he was not disabled before he turned fifty.

Tackett requested that the Appeals Council review the ALJ's decision insofar as it denied benefits from September 1991 to February 1995. See 20 C.F.R. § 404.901(a)(4). On May 30, 1996, the Appeals Council declined Tackett's request for review. At this point, the ALJ's ruling became the final decision of the Commissioner. See 20 C.F.R. § 404.981. Tackett then sought review in federal court. See 20 C.F.R. § 404.901(a)(5); 42 U.S.C. § 405(g). In accordance with 28 U.S.C. §§ 636(b)(1)(B) and (C), the district judge referred the matter to a magistrate judge. The magistrate judge recommended that the ALJ's decision be affirmed because it was supported by substantial evidence and was free from errors of law. See 42 U.S.C. 405(g); Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.1986) ("The Secretary's decision denying benefits will be disturbed only if it is not supported by substantial evidence or based on legal error."). The district court adopted the magistrate judge's Report and Recommendation on October 30, 1997, and issued an order affirming the ALJ's decision.

Tackett appeals the district court's order affirming the ALJ's decision. He contends that the ALJ's decision to deny benefits from September 1991 to February 1995 was not supported by the evidence and was based on errors of law. We agree.

## II. Standard of Review.

We review de novo the decision of the district court affirming the decision of the ALJ. See Matney v. Sullivan, 981 F.2d 1016, 1018 (9th Cir.1992). This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. See Penny v. Sulli-

*van,* 2 F.3d 953, 956 (9th Cir.1993); *Matney,* 981 F.2d at 1018.

■■■■■ Substantial evidence is defined as "more than a mere scintilla but less than a preponderance." *Matney,* 981 F.2d at 1018 (internal quotations and citations omitted). "If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Id.* But the Commissioner's decision "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan,* 143 F.3d 1240, 1243 (9th Cir. 1998). Rather, a court must "consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Penny,* 2 F.3d at 956.

### III. *Establishing Disability Under the Social Security Act.*

To establish a claimant's eligibility for disability benefits under the Social Security Act, it must be shown that: (a) the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). If a claimant meets both requirements, he or she is "disabled."

■■■■■ The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security

Act. *See* 20 C.F.R. § 404.1520. The burden of proof is on the claimant as to steps one to four.[3] As to step five, the burden shifts to the Commissioner. If a claimant is found to be "disabled" or "not disabled" at any step in the sequence, there is no need to consider subsequent steps. *See id.*

The five steps are:

Step 1. Is the claimant presently working in a substantially gainful activity?[4] If so, then the claimant is *"not disabled"* within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).

Step 2. Is the claimant's impairment severe? If not, then the claimant is *"not disabled"* and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).

Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is *"disabled"* and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).

Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is *"not disabled"* and is not entitled to disability insurance

---

**3.** As noted by our sister circuit, the application of burdens of proof "is particularly elusive in cases involving social security benefits, in part because the proceedings are not designed to be adversarial." *Donato v. Secretary of Dept. of Health & Human Servs. of the United States,* 721 F.2d 414, 418 (2d Cir.1983) (internal quotations omitted). In addition, the ALJ's *affirmative duty* to assist a claimant to develop the record further complicates the

allocation of burdens. *See* 20 C.F.R. § 404.1512(d). Notwithstanding the fact that the ALJ shares the burden at each step, we use the term burden of proof for convenience.

**4.** Substantial gainful activity is work activity that is both substantial, i.e., involves significant physical or mental activities, and gainful, i.e., work activity performed for pay or profit. *See* 20 C.F.R. § 404.1572.

benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(e).

Step 5. Is the claimant able to do any other work? If not, then the claimant is *"disabled"* and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is *"not disabled"* and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is *"disabled"* and therefore entitled to disability benefits. *See id.*

### A. Steps One and Two are Not in Dispute.

The ALJ found that Tackett had not engaged in substantial gainful activity since September 16, 1991. The ALJ also found that Tackett had "severe impairments due to degenerative joint disease of both knees." Consequently, Tackett met steps one and two. We proceed to step three.

### B. Step Three: The ALJ's Determination that Tackett's Impairments Did Not Meet or Equal a Listed Impairment is Supported by Substantial Evidence.

At step three, the ALJ determines if a claimant's impairment meets or equals an impairment listed in Appendix 1 to Subpart P of Regulations No. 4. The Listing of Impairments ("the List") describes specific impairments of each of the major body systems "which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. If a claimant meets or equals a listed impairment he or she will be found disabled at this step without further inquiry. *See* 20 C.F.R. § 404.1520(d).

■ The List describes the characteristics of each impairment. The description includes the "symptoms, signs and laboratory findings" that make up the characteristics of each listed impairment. 20 C.F.R. § 404.1525. To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim. To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment, or, if a claimant's impairment is *not* listed, then to the listed impairment "most like" the claimant's impairment. 20 C.F.R. § 404.1526.

■ If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment. *See id.*

■ Tackett argues that the ALJ erred in concluding that his impairments did not meet or equal a listed impairment. We disagree with this argument.

Tackett claims that he meets or equals Listed Impairment 1.03, which is "[a]rthritis of a major weight-bearing joint." To be found disabled at step three, Tackett had to establish that he met or equaled each of the following characteristics of listed impairment 1.03:

(i) marked limitation of motion or abnormal motion of the knee;

(ii) history of persistent joint pain and stiffness;

(iii) gross anatomical deformity;

(iv) reconstructive surgery or surgical arthrodesis; and

(v) a markedly limited ability to walk and stand.

*See* 20 C.F.R. § 404, Subpt. P, App. 1, 1.03.

The ALJ's medical expert reviewed Tackett's medical records and concluded that Tackett's knee problems met the second through the fifth characteristics listed above. But the expert testified that he could not find clear evidence that Tackett met the first characteristic of "marked limitation of motion or abnormal motion" of the knee, and accordingly the expert would not state that Tackett met all of the above characteristics for listed impairment 1.03.

Tackett argues to the contrary. He asserts that the ALJ's medical expert's testimony in fact *supports* Tackett's contention that there was abnormal motion of his left knee. Tackett's argument is meritless. The ALJ's medical expert's testimony was based on the available medical evidence, including reports from Dr. Watkindorf and Dr. Roberts, two of Tackett's examining physicians, who stated that Tackett had full range of motion in his left knee. Based on these reports, the ALJ's medical expert testified that, although he was unsure of what "abnormal motion" meant, the medical evidence showed that Tackett had full range of motion in his knees.

Consequently, there is substantial evidence to support the ALJ's conclusion that Tackett did not suffer from abnormal motion of either knee and therefore did not meet listed impairment "1.03 Arthritis of a major weight-bearing joint."

■ Tackett also argues that even if his impairments do not *meet* the five characteristics for a finding of disability under listed impairment 1.03, his impairments are *equal to* listed impairment 1.03. *See* 20 C.F.R. § 404.1520(d); *Lester v. Chater*, 81 F.3d 821, 828 (9th Cir.1995) ("Claimants are conclusively disabled if their condition either meets or equals a listed impairment."). Tackett asserts that the ALJ's medical expert's testimony that Tackett

suffered from "a significant functional problem with respect to his knees" established that Tackett's impairment was equal to listed impairment 1.03. This argument is also without merit. "Medical equivalence must be based on medical findings." 20 C.F.R. § 404.1526. A generalized assertion of functional problems is not enough to establish disability at step three. *See id.*

Tackett also argues that the ALJ failed to fully and fairly develop the record at this step. We again disagree. The ALJ thoroughly discussed the medical evidence in the record and properly considered all of Tackett's allegations of impairments.

The ALJ's determination that Tackett's impairments did not meet or equal a listed impairment was supported by substantial evidence in the record as a whole. Therefore, Tackett is not entitled to a finding of disability at step three. We proceed to step four.

**C.** ***Step Four: Tackett is Unable to Return to his Former Work.***

It is undisputed that Tackett's knee problems prevent him from doing the machinist work he did in the past. Therefore, we proceed to the final step, step five.

**D.** ***Step Five: Tackett's Ability to Perform Other Work Was Not Properly Ascertained.***

1. *Vocational Experts and the Medical Vocational Guidelines.*

Once a claimant has established that he or she suffers from a severe impairment that prevents the claimant from doing any work he or she has done in the past, the claimant has made a prima facie showing of disability. At this point—step five—the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience. 20 CFR § 404.1560(b)(3). There

are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can perform: (a) by the testimony of a vocational expert, *or* (b) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. *See Desrosiers v. Secretary of Health and Human Servs.,* 846 F.2d 573, 577–78 (Pregerson, J., concurring) (9th Cir.1988).

### (a) *Vocational Expert.*

■ At step five, the ALJ can call upon a vocational expert to testify as to: (1) what jobs the claimant, given his or her residual functional capacity, would be able to do; and (2) the availability of such jobs in the national economy. At the hearing, the ALJ poses hypothetical questions to the vocational expert that "set out all of the claimant's impairments" for the vocational expert's consideration. *Gamer v. Secretary of Health and Human Servs.,* 815 F.2d 1275, 1279 (9th Cir.1987). The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record. *See id.* at 1279–80. The vocational expert then " 'translates [these] factual scenarios into realistic job market probabilities' by testifying on the record to what kinds of jobs the claimant still can perform and whether there is a sufficient number of those jobs available in the claimant's region or in several other regions of the economy to support a finding of 'not disabled.' " *Desrosiers,* 846 F.2d at 578 (Pregerson, J., concurring) (internal citations omitted.)

### (b) *Medical–Vocational Guidelines.*

In some cases, it is appropriate for the ALJ to rely on the Medical–Vocational Guidelines to determine whether a claimant can perform some work that exists in "significant numbers" in the national economy. The Medical–Vocational Guidelines are a matrix system for handling claims that involve substantially uniform levels of impairment. *See* 20 C.F.R. pt. 404, subpt. P, app 2.

The Guidelines present, in *table form,* a short-hand method for determining the availability and numbers of suitable jobs for a claimant. These tables are commonly known as "the grids." The grids categorize jobs by their physical-exertional requirements and consist of three separate tables-one for each category: "[m]aximum sustained work capacity limited to sedentary work," "[m]aximum sustained work capacity limited to light work," and "[m]aximum sustained work capacity limited to medium work." [5] 20 C.F.R. pt. 404, subpt. P, app. 2, rule 200.00. Each grid presents various combinations of factors relevant to a claimant's ability to find work. The factors in the grids are the claimant's age, education, and work experience. For each combination of these factors, e.g., fifty years old, limited education, and unskilled work experience, the grids direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical-exertional requirements. *See id.*

This approach allows the Commissioner to streamline the administrative process and encourages uniform treatment of claims. *See Heckler v. Campbell,* 461 U.S. 458, 460–462, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing the creation and purpose of the Medical–Vocational Guidelines).

■ The Commissioner's need for efficiency justifies use of the grids at step five where they *completely and accurately* represent a claimant's limitations. *See* id. at 461. In other words, a claimant must be able to perform the *full range* of jobs in a given category, i.e., sedentary work, light work, or medium work. As explained in *Desrosiers:*

> This court has recognized that significant non-exertional impairments, such as poor vision or inability to tolerate dust or gases, may make reliance on the

---

**5.** If a claimant is found able to work the full range of heavy work this is "generally sufficient for a finding of not disabled." 20 C.F.R. pt. 404, subpt. P, app. 2, § 204.00.

grids inappropriate. We have also held that pain can be a non-exertional limitation.

However, the fact that a non-exertional limitation is alleged does not automatically preclude application of the grids. The ALJ should first determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations.

... A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines. In such a case, the guidelines would be inapplicable.

846 F.2d at 577 (Pregerson, J., concurring) (internal citations omitted). The ALJ may rely on the grids alone to show the availability of jobs for the claimant "only when the grids accurately and completely describe the claimant's abilities and limitations." *Jones v. Heckler,* 760 F.2d 993, 998 (9th Cir.1985); *see also,* 20 C.F.R. pt. 404, subpt. P, app. 2, rule 200(e); *Desrosiers,* 846 F.2d at 577. Examples of non-exertional limitations are pain, postural limitations, or environmental limitations. *See id.*

2. *The ALJ Improperly Disregarded Medical Evidence of Tackett's Non-Exertional Limitations and Erred in Failing to Call a Vocational Expert.*

 At step five in the instant case, the ALJ concluded that Tackett's limitations were adequately covered by the grids. Consequently, the ALJ did not call a vocational expert to establish the availability of suitable jobs in the national economy. This was error. Because Tackett suffers from non-exertional limitations not contemplated by the grids, the ALJ was required at step five to call upon a vocational expert to establish whether Tackett was disabled.

(a) *The ALJ Erred in Disregarding Medical Evidence That Tackett Suffered From Non–Exertional Limitations.*

Tackett's treating physicians and the ALJ's medical expert expressed the opinion that Tackett was not "totally precluded" from doing some form of sedentary work. But the doctors also expressed the opinion that Tackett's knee problems required him to change positions, shift his body, walk, or stand about *every half hour.* Notwithstanding this medical evidence, the ALJ found that "[Tackett] could sit throughout an eight hour workday with normal breaks *every two hours* to allow for the need to change his position." Consequently, the ALJ determined that Tackett could work the full range of sedentary jobs and that application of the grids was therefore appropriate. In making this determination, the ALJ failed to give proper weight to the opinions of Tackett's treating physicians and the ALJ's own medical expert. *See Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir.1998) ("Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons.").

 The ALJ must set out in the record his reasoning and the evidentiary support for his interpretation of the medical evidence. *See Lester,* 81 F.3d at 832 (reversing ALJ because rejection of treating and examining physicians' opinions was based on unsupported speculation that physicians were misrepresenting claimant's condition or were not qualified to evaluate it).

Here, the doctors agreed that Tackett had to change positions, shift his body, walk, or stand about *every half hour* to prevent the knee from "gelling" or locking up on him. The ALJ's own medical expert expressed the opinion that Tackett could work at a job, sitting "for up to 30 minutes at a time ... so long as he could shift when he needed to." Shifting, the expert explained, meant "[g]etting up and moving around as needed. No prolonged work in

a single position, frequent position changes as needed."

There is no medical evidence to support the ALJ's finding that Tackett could work through an eight hour workday with breaks every two hours. Instead of relying on the opinions of the physicians, the ALJ apparently relied on Tackett's testimony of a road trip he took to California. Tackett testified that he moved to California with the hope that "the weather out there would help with the arthritis and things like this." Tackett traveled with his fiancee, driving about 500 miles per day and stopping frequently. California's climate did not provide the relief Tackett sought, so he left four months later, traveling by plane on the return trip.

The ALJ acknowledged that, "[the medical expert] felt the evidence showed [Tackett] had the ability to sit throughout an eight hour workday *so long as he could get up briefly or shift positions every 30 minutes or so."* (Emphasis added). But because of Tackett's testimony concerning the California trip, the ALJ found, contrary to the expert's testimony, that "[Tackett] could sit throughout an eight hour workday with normal breaks *every two hours* to allow for the need to change his position." (Emphasis added).

There is no evidence on how much cross-country driving Tackett did, if any. There is no evidence of the frequency or the duration of the rest stops. There is no evidence whether Tackett rode sitting up, reclining, or lying down in the back seat. Evidence that Tackett took a four-day road trip to California, without more, is insufficient to counter the opinion of Tackett's treating physicians and the ALJ's own medical examiner that Tackett needs to shift positions "every 30 minutes or so."

Consequently, the ALJ's determination that Tackett could sit throughout an eight hour workday for two hours at a time is not supported by substantial evidence in the record as a whole.

(b) *Because Tackett Suffers From Significant Non–Exertional Limitations, i.e., the Need to Shift Positions Every 30 Minutes, the ALJ Erred in Finding Tackett "Not Disabled" at Step Five Without Consulting a Vocational Expert.*

Because the ALJ believed that Tackett could sit through an eight-hour work day with normal breaks every two hours, the ALJ concluded that Tackett's residual functional capabilities allowed him to perform the full range of sedentary work and that use of the grids was appropriate. The ALJ applied the grids for sedentary work and found that, as a "younger individual," Tackett was "not disabled" until his fiftieth birthday on February 7, 1995. At that time, Tackett became "an individual approaching advanced age" and the grids directed a finding of "disabled." 20 C.F.R. pt. 404, subpt. P, app. 2, rules 202.12, 202.21.

"Sedentary work" contemplates work that involves the ability to sit through most or all of an eight hour day:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although *a sedentary job is defined as one which involves sitting,* a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a) (emphasis added). While some sedentary jobs *may* require some walking and/or standing, others may not require any. Thus, to be physically able to work the full range of sedentary jobs, the worker must be able to sit through most or all of an eight hour day.

The grids should be applied only where a claimant's functional limitations fall into a standardized pattern "accurately and completely" described by the grids. *Jones,* 760 F.2d at 998. Tackett's need to shift, stand up, or walk around every 30 minutes is a significant non-exertional limi-

tation not contemplated by the grids. It is easy to imagine the problems this non-exertional limitation would cause in many sedentary jobs which require sitting during most or all of an eight hour day such as some assembly line jobs, or jobs as a phone operator or dispatcher. Eighty-five percent of the unskilled sedentary jobs "are in the machine trades and benchwork occupational categories." 20 C.F.R. pt. 404, subpt. P, app. 2, rule 201.00(a). Because Tackett's non-exertional limitations "significantly limit the range of work" he can perform, mechanical application of the grids was inappropriate. *Desrosiers,* 846 F.2d at 577. Consequently, to determine whether Tackett was disabled before reaching his fiftieth birthday, the ALJ was *required* to take the testimony of a vocational expert. By concluding that Tackett was not disabled without the aid of the testimony of a vocational expert, the ALJ committed reversible error.[6]

## IV. *Conclusion.*

We remand Tackett's case to the Social Security Administration for reconsideration of Tackett's disability status between September of 1991 and February of 1995. The Medical–Vocational Guidelines (the grids), 20 C.F.R. pt. 404, subpt. P, app. 2, do not accurately and completely describe Tackett's limitations. Therefore, to establish whether Tackett was disabled under the Social Security Act before his fiftieth birthday, the ALJ must hear testimony from a vocational expert.

REVERSED and REMANDED.

---

6. Tackett also claims that the ALJ erred in denying him additional time to provide psychiatric evidence of his post-traumatic stress disorder, diagnosed by the Veteran's Administration in 1994. The ALJ mistakenly stated that Tackett had turned 50 in 1994 and, consequently, the VA psychiatric report would not be "necessary" because, applying the grids, Tackett was considered disabled after the age of 50 based on his knee problems

alone. In fact, Tackett was 49 in 1994, and the psychiatric report may contain relevant evidence of additional non-exertional (psychological) impairments. The ALJ should consider this report on remand.

